1

2

3

4              IN THE UNITED STATES DISTRICT COURT

5           FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7                                      No. 14-05069 CW

8  DEMETROIS TERRELL DIXSON,

         Petitioner,                   ORDER GRANTING
9                                       MOTION TO DISMISS
     v.                                 THE PETITION AS
10                                      UNTIMELY

11 SECRETARY, Department of
   Corrections and Rehabilitation,
12
         Respondent.
13 _____/

14

15      In March 2006, an Alameda County jury convicted Petitioner

16 Demetrois Dixson of multiple felonies, including forcible sexual

17 offenses against his girlfriend, Amitha.[1]  These charges included

18 forcible rape, unlawful sexual intercourse with a minor, battery

19 with serious bodily injury, corporal injury to a cohabitant,

20 forcible sodomy, and forcible oral copulation.  Petitioner has

21 filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

22 § 2254, challenging his state criminal conviction and asserting

23 that he is actually innocent.  Respondent has filed a motion to

24

25

26 _____

27      [1] Amitha is referred to as "A." in some documents in the
   record, "Amitha H." in others and by her full name in still
28 others.  This order will refer to her as "Amitha."

United States District Court
For the Northern District of California

dismiss the petition, arguing that it is procedurally defaulted and untimely.  Petitioner has filed a reply.  Having considered the parties' papers the Court finds that the habeas petition is untimely and GRANTS Respondent's motion to dismiss.  Because the petition is untimely, the Court does not reach Respondent's argument that Petitioner's claims are procedurally defaulted.

BACKGROUND

The following background facts, including footnotes, are taken from the California Court of Appeal decision denying Petitioner's direct appeal.  All citations are to the California Penal Code.

Prosecution Evidence

A. grew up in Lancaster, California, a small town in Los Angeles County.  Her parents, who were from Sri Lanka, were very protective of her and did not allow her to date in high school.  In August 2004, when she was 17 years old, A. began her freshman year at the University of California, Berkeley, where she lived in a dorm room.  Her close friend Anita Suri also enrolled at Berkeley.

One afternoon in late September 2004, A. was approached by appellant in a campus yogurt shop.  They spoke briefly and exchanged telephone numbers. Appellant was 28 years old at the time, although he told A. he was 21.  He called her a few minutes after leaving the shop and A. agreed to join him for dinner.

Appellant bought a pizza and lemonade at the supermarket and then drove A. to a sparsely furnished apartment in Fairfield.  After they finished the pizza, appellant kissed A., who felt nervous but did not say anything.  He tried to take her pants off, but she told him she didn't want to do anything.  Appellant removed her pants, pushed her legs open and forced her to have unprotected intercourse.  He refused to drive her home when he had finished, claiming to be tired.  The next morning, he wanted to have sex again, but A. told him she needed to get to class.  He drove her back to Berkeley. A. did not believe she had been raped because

2

**United States District Court**
For the Northern District of California

appellant had not used violence, and she was too
embarrassed to tell anyone what had happened.  (Counts
1 & 2, forcible rape (§ 261, subd. (a)(2)) and unlawful
intercourse with a minor (§ 261.5, subd. (c)).)

Appellant called A. and they saw each other again.
They argued about whether appellant had raped her on
their first date, but A. continued to see appellant
because he was nice to her in other ways.  She did not
tell her parents about the relationship because they
would have disapproved.  Over time, appellant became
abusive, and A. became estranged from her friends.

In October 2004, A. met appellant in San Diego.
After an argument in a restaurant about how little she
ate, he left her in the restaurant and drove away.  He
later returned and told her he and some friends would
rape her and leave her in a ditch.  Later during the
visit to San Diego, appellant poured a drink over A.
and wrapped a pillow case around her neck so tightly
she could not breathe.  Once, while in a shopping mall
in Fairfield, appellant checked the memory of A.'s cell
phone and saw that her old boyfriend had called.  He
spat in her face and left her stranded at the mall;
when he returned and discovered her talking on her
phone to a friend he grabbed the phone and told the
friend not to call A. again.

Shortly before Thanksgiving, A. learned she was
pregnant.  Appellant seemed happy at first, but after
an argument told her to get an abortion.  A. suffered a
miscarriage a few days later.  A. told appellant she
wanted to break up, but he threatened her with violence
so she continued to see him.  Students in the dormitory
sometimes heard A. cry as appellant yelled at her and
threatened her.  At least one student noticed bruises
on A.'s neck, face and arms.

On December 21, 2004, appellant and A. argued
about some charges appellant had run up on her cell
phone.  Appellant pushed and choked A., then grabbed
one of her fingers and squeezed her cheeks for about 30
seconds, until the inside of her cheeks were cut by her
teeth.  A. started to spit up blood and they continued
to argue for about half an hour.  The dormitory's
resident director, Cora Gerdes, came to the door after
another resident reported that someone was crying and
yelling in A.'s room.  Gerdes spoke privately with A.,
who said she was crying because she was feeling very
ill, but claimed not to need help.  Appellant had told
A. that if she ever reported him, he would come after
her. (Count 3, battery with serious bodily injury (§
243, subd. (d)).)

A. spent the winter break at her parents' house in Lancaster.  Her jaw was still swollen from appellant's attack and the skin of her interior cheeks seemed to be infected.  Her parents took her to see their family doctor, but she could not explain the injuries to him and said she might have caught mononucleosis.  The doctor believed her symptoms were consistent with either mononucleosis or trauma.

Appellant called A. nearly every day over her break to threaten her and ask her for money.  He told her once that if she didn't send money, he and his cousins would come to her house with a gun.  Appellant also called A.'s mother and, using different names, demanded to know A.'s whereabouts.  When she went to the airport to fly back to Berkeley, appellant picked her up and drove her to San Diego, causing her to miss class.  She gave him money and got more from her parents.

After winter break, appellant began living in A.'s dorm room full time.  A.'s roommate Jessica Chan saw appellant and A. argue several times.  Once A. called the police to get appellant out of the room, but appellant hung up the phone.  A. did enlist the campus police in helping her get appellant's things out of her room, but she did not tell them about the violence.  Afterwards, appellant drove her around and yelled at her about contacting the police.  He hit her and squeezed her forehead with his hands, but later apologized and put bandages on the cuts he had caused.

On January 25, 2005, A. took a handful of Tylenol pills because she "couldn't deal with it anymore."  Appellant took her to the emergency room, where she said she had taken the pills because her stomach had been hurting.  A nurse pulled A. aside, commented that appellant was very controlling, and asked whether she had taken the pills because of appellant.

On February 17, 2005, appellant became angry with A. when her friend Anita arrived to watch television while he was still in bed.  He asked Anita to wait outside and squeezed A.'s cheeks until they were bleeding on the inside and she was choking on her own blood.  He punched her in the leg and told her he hoped she couldn't walk.  (Count 4, corporal injury on a cohabitant (§ 273.5, subd. (a)).)

After this incident, A. told Anita everything that had been going on.  Anita did not call the police because A. wanted to handle it her own way.  Later that month, appellant punched A. in the mouth and caused her lip to bleed after she told him she was going out with

4

Anita.  When they stopped at a service station to get ice for her lip, he hit her again because she did not tell him the ice was melting.

On March 13, 2005, appellant dragged A. downstairs from her dorm room after he had to spend the night in his car because her roommate Jessica was working on a term paper.  He hit her in the elevator, dragged her into the recycling room, and put his knee on her neck. When he had finished his attack, A. had scratches on her face and was bleeding.  (Count 5, corporal injury on a cohabitant (§ 273.5, subd. (a)).)

Appellant stayed in A.'s dorm room while A. went home to Lancaster on spring break.  He looked on her computer and saw she had been corresponding by email with her friend Justin Johnson.  Appellant called A. and yelled at her for talking to another man and then drove to Lancaster and began leaving messages on her cell phone.  Appellant told her that if she did not meet him he would crash into her parents' car or throw a brick through their window.  A. agreed to meet appellant at a motel.

When she arrived at the motel, appellant told A. to get into his car, where he threw down copies of A.'s email messages with Justin and yelled at her for telling other people their business.  He hit her in the mouth, causing her to bleed.  When she refused to give him Justin's phone number, he grabbed her leg and squeezed it, stating he would rip her flesh out. Appellant drove back to the motel and told A. to go into the room, which she did, because she knew he would follow her if she did not.  Inside the room, appellant hit her on the face and told her she "better give him some to calm him down."  A. took off her clothes because she was afraid.  She was crying and her mouth was bleeding, but appellant forced her to orally copulate him.  After that, he raped her, sodomized her and urinated on her, hitting her in the face with an open hand.  Appellant hit her again on the side of her head as she was getting dressed to leave.  (Counts 6, 7 & 8, forcible rape (§ 261, subd. (a)(2)), forcible sodomy (§ 286, subd. (c)(2)), forcible oral copulation (§ 288a, subd. (c)(2)).)  A. went to dinner with Anita and another friend that night, both of whom urged her to report appellant to the police.  She told them she wanted to handle things her way, without angering appellant.

In late March, A. learned she was pregnant again and told appellant.  He pushed her into a closet during an argument on that same night.  While driving her

United States District Court
For the Northern District of California

around the next day, he punched her in the face when she could not remember something he had said.  A. emailed her friend Justin and asked to talk, but when he tried to call her appellant took the phone away and told him to stop calling.  Appellant repeatedly threatened Justin and told him to stay away from A.

On April 1, 2005, appellant took a trip to San Diego.  Before he left, he and A. argued because he wanted to have sex and she said she did not because her stomach hurt.  Appellant promised to go slowly and not hurt her, but when they had sex A. cried the whole time and said he was hurting her.  (Count 9, forcible rape (§ 261, subd. (a)(2)).)

On April 5, 2005, A. met with resident director Gerdes, who wanted to ask her about reports that someone else was living in her dorm room.  A. told Gerdes about appellant's violent conduct, but said she did not want to go to the police without first learning how long appellant could be held in custody.  Gerdes notified security in the dormitory that appellant was no longer welcome there.

Appellant checked A.'s voicemail and learned of her meeting with Gerdes.  He called her from San Diego and said he was going to fly to Berkeley that night, punch her in the face and stomach, and give her a "Demetrois abortion."  A. told Gerdes about the call and spent the night with Anita.  Appellant flew back to the Oakland airport that same evening, where he called A. and told her to pick him up.  A. refused to pick him up.  (Count 10, criminal threats (§ 422).)

Appellant went to A.'s dormitory that evening and was told by Gerdes to leave.  He responded that A. was his girlfriend, that she was pregnant with his child, and that they were just having a hard time.  Gerdes overheard appellant yelling at A. over the phone. Appellant called A.'s parents in Lancaster later that same evening and told them he and A. were in love, that A. was pregnant, and that she was afraid to tell them of the relationship because she knew they would not approve.

Appellant returned to A.'s dorm room the next morning, where Anita answered the door while A. remained inside.  Appellant spoke to Anita for several hours in the lounge, telling her that everything was unfair and he wanted to work things out with A.  Anita told appellant she would talk to A. on his behalf. With Gerdes's help, the girls sneaked out of the dorm room and met A.'s mother, who had arrived in Berkeley that morning.

A. reported appellant to the police and obtained a restraining order. Appellant was arrested and was served with the restraining order on April 12, 2005, while he was in jail. Appellant called A. on April 13 and asked her to drop the charges. A. told him he should not be calling her. He telephoned her several more times that day while she was with her mother and two police officers. One of the officers got on the telephone and told appellant that he had a restraining order and should not be contacting A. Appellant said he was confused because she had called him. (Counts 11, 12 & 13, misdemeanor disobeying a domestic relations restraining order (§ 273.6, subd. (a)).)

On April 16, 2005, Anita received about 10 telephone calls from appellant, in which he told her he was innocent and she was the only one who could talk to A. about changing things. Anita pretended to agree with appellant because she was afraid of him. A woman called her from a blocked telephone number a few minutes later and said, "Demetrois knew where [Anita] lived in Berkeley and at home." Appellant called again and told Anita he was recording their conversation; Anita again pretended to agree with appellant about his version of various events because she was afraid of him. (Count 14, attempting to dissuade a witness (§ 136.1, subd. (a)(2)).)

Also on April 16, appellant left messages on A.'s voice mail in which he played portions of his conversation with Anita and tried to discourage her from prosecuting the case. He did not stop calling her until June. (Count 15, dissuading a witness from prosecuting a crime (§ 136.1, subd. (b)(2)), and count 16, knowingly violating protective order (§ 166, subd. (c)(1)).)

A. was not the first woman appellant had victimized during an intimate relationship. In 2000, he met L.D.[2] in a shopping mall and they began dating. A month or so after they met, he began hitting her regularly. He once put a gun to her head and would frequently squeeze her mouth so hard that the inside of her mouth and jaw would be sore. Despite the abuse, the couple married. The abuse escalated and in 2003, L. learned she was pregnant. Appellant continued to hit her during the pregnancy and threatened to do a

[2] L.D. and Jamie A. were called as witnesses by the prosecution and testified to prior acts of domestic violence admissible under Evidence Code section 1109.

number of violent acts to cause a miscarriage.  L. gave birth and, although she tried to give appellant a chance, the abuse continued.  She eventually left appellant in early 2004.

Appellant met Jamie A. in February 2004 when he introduced himself to her in a parking lot.  They had moved in together within a few weeks and she continued to see him until October 2004.  About a month into the relationship, appellant became abusive.  He threw a speaker at her during an argument, cutting her lip, and once grabbed her cheeks and squeezed so hard that her teeth cut the inside of her mouth.  Jamie finally broke off the relationship and reported her car stolen when appellant refused to return it to her.  By that time, appellant was dating A., who posted bail when appellant was caught driving Jamie's car and was arrested for driving a stolen vehicle.

According to Dr. Linda Barnard, an expert on domestic violence, one of the misconceptions about a domestic violence situation is that women who don't leave the relationship either enjoy it or are exaggerating the extent of the abuse.  Domestic violence is about power and control, and the perpetrator usually denies responsibility and suggests instead that the victim is the one to blame.  The typical cycle of abuse involves tension building, then verbal abuse, then pushing or shoving, followed by more acute physical, sexual or emotional abuse.  After this apex of conflict, there is a honeymoon period where the abuser apologizes.  This is especially damaging for the victim, who comes to deny her own reality.  Many victims of domestic violence exhibit the symptoms of post-traumatic stress disorder, which places them in a numbed emotional state.  They also lie about or minimize the abuse because of their "traumatic bond" with the abuser and because they are embarrassed about submitting to such treatment.

### Defense Evidence

Appellant testified on his own behalf and denied that he was ever violent with A., Jamie or L., nor did he ever force A. to have sex.  A. was very jealous about other women, and he thought she might be lying about her child being his because she wanted to get him to assume the role of the baby's father.  Appellant did not read the restraining order A. obtained because he was frustrated and did not know what was going on.  In his view, his relationship with A. had been "perfect."

United States District Court
For the Northern District of California

People v. Dixson, 2008 WL 1813175, *1-*6 (Cal. Ct. App.).  In 2006, Petitioner was convicted of three counts of forcible rape, one count of unlawful sexual intercourse with a minor, one count of battery with serious bodily injury, two counts of corporal injury to a cohabitant, one count of forcible sodomy, one count of forcible oral copulation, one count of making criminal threats, three counts of disobeying a domestic relations court order, one count of attempting to dissuade a witness from appearing in court, one count of dissuading a witness from assisting the prosecution and one count of disobeying a stay away order.  On April 22, 2008, the California Court of Appeal affirmed the convictions but remanded for resentencing.  Id. at *16.

On May 12, 2008, represented by counsel, Petitioner filed a petition for review, raising the same issues he raised in his direct appeal, in the California Supreme Court.  The California Supreme Court summarily denied the petition on July 23, 2008.  Respondent's Ex. 3.

On May 24, 2012, Petitioner filed a habeas petition in the Alameda County Superior Court, asserting that he had new evidence that proved his actual innocence of Counts 6, 7 and 8, forcible

**United States District Court**
For the Northern District of California

rape, forcible sodomy and forcible oral copulation.[3]  Respondent's Ex. 5.  Petitioner attached several documents to his petition. First, Petitioner attached a declaration from a man named Shelton Wadsworth, who declared that he had met Petitioner on the prison yard in 2010.  Respondent's Ex. 5.  Wadsworth declared that, when he met Petitioner, he thought Petitioner looked familiar.  While they were talking, Petitioner described his car, a Mercedes Benz. Wadsworth declared that, after hearing the description of the car, "right then and there" he remembered how he knew Petitioner. Wadsworth declared that he remembered Petitioner because he had seen him five years earlier when Petitioner drove away from a Motel 6 in Lancaster in a nice car.  Wadsworth decided that he would rob Petitioner because Petitioner was alone in the car, so he followed Petitioner to a car wash and then to a Sprint store. Wadsworth declared that that evening, he saw Petitioner again in Palmdale and followed him to a different Motel 6 in Palmdale. Wadsworth saw a woman get out of Petitioner's car and go into the office.  The woman returned to the car and Petitioner drove to park by a room.  The woman and Petitioner went into the room. Wadsworth parked next to Petitioner's car and waited for over an

---

[3] Respondent notes that, between 2010 and 2013, Petitioner filed multiple pro se petitions in the Alameda County Superior Court, the California Court of Appeal and the California Supreme Court.  See Respondent's Ex. 4.  However, none of those petitions was attached to the instant federal habeas petition, nor does Petitioner argue that they are relevant to the instant petition or that they tolled the federal statute of limitations.

**United States District Court**
For the Northern District of California

hour, when another car drove up.  The woman came out of the room and greeted the two girls in the car.  Wadsworth stated that the woman and the girls were initially in a good mood but had some sort of argument.  Wadsworth declared that Petitioner later showed him a photograph of Amitha, and he was "100% sure" the woman in the picture was the woman he saw leaving the motel room five years earlier.

Petitioner also submitted a purported receipt for a room at a Motel 6 in Palmdale for the night of March 23, 2005 in Amitha's name as well as a purported receipt for a room at the Motel 6 in Lancaster for the night of March 22, 2005 in Petitioner's name. Petitioner also submitted a declaration stating that he was recanting his trial testimony that he had driven Amitha to a motel in Lancaster.  Instead, he declared, he took Amitha to a motel in Palmdale.

In addition, Petitioner submitted a letter from a private investigator describing an August 6, 2010 conversation with Anita Suri.  The investigator stated that he had a list of questions he was to ask regarding Petitioner's case, but that he did not know the context of the questions.  Among other things, the private investigator wrote that Suri told him that she had seen Amitha at a Motel 6 "on Palmdale Boulevard" on an unspecified date and that Amitha had not appeared to be injured or upset at the time. Finally, Petitioner submitted a typed letter, purportedly sent by Amitha to Petitioner's mother.  The letter expressed remorse about

United States District Court
For the Northern District of California

Petitioner and stated that Amitha lied about Petitioner forcing her to have sex and hitting her because she was scared of her parents.

On July 23, 2012, Judge Horner of the Alameda County Superior Court denied the petition for habeas corpus "for failure to state a prima facie case for relief." Respondent's Ex. 6.  A footnote to the order stated, "The 'declarations' submitted in support of the Petition are not originals."  Id.

On November 1, 2012 Petitioner filed an amended habeas petition in the Alameda County Superior Court, reiterating his claim of actual innocence and raising for the first time an ineffective assistance of counsel claim, alleging that trial counsel was ineffective for failing to investigate and discover the evidence of Petitioner's actual innocence.  At the bottom of the purported letter from Amitha, mailed to his mother, Petitioner typed,

> On May 24, 2012 the superior court of Alameda County
> denied the state habeas corpus per case #150971 because
> petitioner did not send the original letter of Amitha []
> in support of the petition.  I Demetrois T. Dixson
> declare under the penalty of perjury that the above is
> in fact the original letter of Amitha [].

Respondent's Exhibit 7.  Below the statement is Petitioner's notarized signature.

On January 15, 2013, Petitioner filed a motion to amend his petition.  Petitioner asserted that his investigator had interviewed Suri's mother, Neena Suri, in November 2012, and that Neena Suri told the investigator that she had hosted a party for

**United States District Court**
For the Northern District of California

her daughter and some of her friends in March 2005.  Neena Suri also purportedly stated that Amitha attended the party and did not appear to have any injuries.

On March 29, 2013, Judge Horner denied the amended habeas petition, stating,

> The Petition is denied as untimely.  Petitioner fails to establish that he diligently pursued his claims, fails to establish good cause for the substantial delay, and fails to establish that either of his claims fall within an exception to the untimeliness bar.
> The Petition is also denied for abuse of the writ.

Respondent's Ex. 9.

On June 13, 2013, Petitioner filed another amended habeas petition in the Superior Court and a challenge to Judge Horner for cause.  Petitioner argued that Judge Horner was biased against him and questioned Judge Horner's previous ruling.  Petitioner argued that his claims were not untimely and that, if they were, it was because of his trial counsel's ineffective representation. Finally, Petitioner resubmitted the purported letter from Amitha, along with a May 22, 2013 declaration from his mother, stating that in February 2012, she received a telephone call from a blocked number and that the caller identified herself as Amitha. The caller told Petitioner's mother that she couldn't talk but that she felt very bad about what happened to Petitioner and that she would write a letter explaining herself.  Petitioner's mother declared that she received the letter a week later.  Respondent's Ex. 10.

United States District Court
For the Northern District of California

In an order dated August 2, 2013, Judge Horner denied the challenge for cause, summarily denied the amended habeas petition and advised Petitioner that he could file a habeas petition in the Court of Appeal.  Respondent's Ex. 11.

On October 21, 2013, Petitioner filed a further amended habeas petition in the Superior Court and, on November 13, 2013, he filed supplemental materials in support of the petition.[4]  On December 19, 2013, Judge Horner denied the further amended petition as "an abuse of the writ."  Respondent's Ex. 12.  Judge Horner noted that Petitioner's only new evidence and argument was evidence regarding Hindu culture and argument that Amitha was motivated to lie about her sexual activity to avoid being disowned by her Hindu parents.  Judge Horner further noted that a habeas petitioner is required to present all of his claims in a single petition and that presenting previously presented claims in subsequent petitions is generally an abuse of the writ.  Finally, Judge Horner noted that Petitioner's purported evidence of his innocence was not reliable.  Judge Horner found that Petitioner's re-litigation of his actual innocence claim was an abuse of the writ.

In January 2014, Petitioner filed a habeas petition in the California Court of Appeal.  Respondent argued that the claims had

---

[4] Neither Petitioner nor Respondent filed a copy of this petition.  However, the Superior Court described the petition in its order denying it.  Petitioner does not dispute the characterization of the petition.

United States District Court
For the Northern District of California

been properly denied and also presented a declaration from Amitha, stating that she had never recanted her testimony and that she had not written the letter filed by Petitioner nor had she ever called his mother.  On June 30, 2013, the Court of Appeal summarily denied the petition.  On July 8, 2014, Petitioner filed a petition for habeas relief with the Supreme Court of California.  The Supreme Court summarily denied review on September 10, 2014.

Petitioner filed the instant petition, raising a claim of actual innocence[5], on November 17, 2014.

LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes a statute of limitations on petitions for a writ of habeas corpus filed by state prisoners.  Petitions filed by prisoners challenging non-capital state convictions or sentences must be filed within one year of the latest of the date on which:

> (A) the judgment became final after the conclusion of direct review or the time passed for seeking direct review;
>
> (B) an impediment to filing an application created by unconstitutional state action was removed, if such action prevented the petitioner from filing;
>
> (C) the constitutional right asserted was recognized by the Supreme Court, if the right was newly recognized by

---

[5] The initial federal habeas petition appears to raise a claim of ineffective assistance of counsel, but Petitioner's response to the motion to dismiss states that "he has not raised ineffective assistance of counsel."  Docket No. 20 at 16.  The Court's finding that the petition is untimely also applies to any ineffective assistance of counsel claim as well.

the Supreme Court and made retroactive to cases on collateral review; or

(D) the factual predicate of the claim could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The one-year statute of limitations is tolled under § 2244(d)(2) for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). Absent any tolling, the expiration date of the limitations period will be the same date as the triggering event in the following year. Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

## DISCUSSION

I. Timeliness

Petitioner's state judgment became final on October 21, 2008, ninety days after July 23, 2008, when the California Supreme Court denied review of the California Court of Appeal's decision on his direct appeal. See Bowen v. Roe, 188 F.3d 1157 (9th Cir. 1999) (direct review includes the ninety day period in which to file a petition for writ of certiorari in the United States Supreme Court). Petitioner argues that he did not discover the factual predicate for his actual innocence claim until approximately March 7, 2012, when he learned of the purported letter from Amitha to his mother recanting her trial testimony. He also argues that

the statute of limitations was tolled following his discovery while he filed his various state habeas petitions.

The Court finds, as the state court found, that the purported letter from Amitha to Petitioner's mother is not reliable newly found evidence.  Indeed, Respondent produced a declaration from Amitha stating that she "did not write or sign" the letter and that she "never telephoned Mr. Dixson's mother."  Respondent's Ex. 15.  Accordingly, the Court finds that the letter was not evidence sufficient to delay commencement of the AEDPA statute of limitations.

Even if the purported letter from Amitha to Petitioner's mother were newly discovered evidence sufficient to delay commencement of the one-year statute of limitations to March 7, 2012, the Court finds that the petition, filed on November 17, 2014, was not timely.  On March 29, 2013, the Alameda County Superior Court denied Petitioner's amended state habeas petition, finding that it was untimely and an abuse of the writ.  As noted above, the AEDPA statute of limitations is only tolled for the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2) (emphasis added).  Petitioner's untimely amended state habeas petition was not "properly filed" for purposes of § 2244(d)(2).  See Pace v. DiGuglielmo, 544 U.S. 408, 410 (2005) ("a state postconviction petition rejected by the state court as untimely"

is not "properly filed"); see also Bonner v. Carey, 425 F.3d 1145, 1149 (9th Cir. 2005) (petition dismissed as untimely by California court is not "properly filed").  Moreover, Petitioner did not challenge in the Court of Appeal the Superior Court's finding of untimeliness.  Instead, Petitioner filed further amended petitions in the Superior Court on June 13, 2013 and October 21, 2013, which were denied as abuses of the writ.

Accordingly, the Court finds that Petitioner's federal habeas petition was not timely filed.

II.  Actual Innocence

Petitioner also argues that he is entitled to federal review of his petition because his underlying claim of actual innocence is meritorious.  In McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013), the Supreme Court addressed the actual innocence gateway established in Schlup v. Delo, 513 U.S. 298 (1995), and held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" allowing federal habeas review even if the petition was filed outside of the statute of limitations. However, for the Schlup "actual innocence" gateway to apply, "a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  Majoy v. Roe, 296 F.3d 770, 776-77 (9th Cir. 2002)(quoting Schlup, 513 U.S. at 327).

United States District Court
For the Northern District of California

The Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare." McQuiggin, 133 S. Ct. at 1928; see also House v. Bell, 547 U.S. 518, 538 (2006) ("the Schlup standard is demanding and permits review only in the 'extraordinary' case"). Claims of actual innocence must be supported by "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup, 513 U.S. at 324.

The evidence produced by Petitioner is not reliable. Moreover, even if taken as true, none of the evidence, except the purported letter by Amitha, would prove Petitioner's innocence. The declaration of Shelton Wadsworth is credible on its face. He declared that, after hearing Petitioner describe his car, he remembered that he had seen Petitioner five years earlier, intended to rob him, and followed him around Lancaster and Palmdale, California. Wadsworth also declared that, after seeing a photograph of Amitha, he was sure that he had seen her leave a motel room, uninjured, on that day five years earlier. Even if this declaration were deemed reliable and Wadsworth had seen Amitha leave a motel room, uninjured on an unspecified date, that fact would not prove that Petitioner had never raped or injured Amitha.

Petitioner argued that the two unauthenticated motel receipts showed that he did not rape Amitha, because she only went to a motel room that she herself had rented. Even if taken as true, the fact that Amitha might have rented the motel room would not prove that Petitioner never raped or injured her. Similarly, even if Anita Suri's and Neena Suri's statements are assumed to be true, their recollections of Amitha's condition on unspecified dates do not prove that Petitioner never raped or injured Amitha.

The only document produced by Petitioner that, if credible, could reasonably call into question his guilt is the purported letter from Amitha. However, that letter is wholly unreliable. Petitioner first presented the letter without authentication. He later attempted to authenticate it himself and, only after the letter was twice rejected by the state court, did he present the declaration from his mother stating that she received the letter in the mail and that Amitha had called her, telling her to expect the letter. As noted above, Respondent produced a declaration by Amitha stating that she did not call Respondent's mother and she neither wrote nor signed the purported letter disavowing her trial testimony. Accordingly, Petitioner's claim of actual innocence does not excuse the untimely filing of his federal habeas petition.

## CERTIFICATE OF APPEALABILITY

A habeas petitioner must be granted a certificate of appealability in order to appeal. See Rule 11(a) of the Rules

Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of appealability in same order that denies petition).  A certificate of appealability should be granted "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Where a petition is dismissed on procedural grounds, as it is here, granting a certificate of appealability has two components: "one directed at the underlying constitutional claims and one directed at the district court's procedural holding."  Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Id. at 484.

The application of the procedural rule in this case is not debatable.  Even if the purported letter from Amitha to Petitioner's mother was newly discovered evidence sufficient to delay commencement of the one-year statute of limitations to March 7, 2012, the federal habeas petition was untimely.  Moreover, the purported evidence of actual innocence was unreliable.  A certificate of appealability is denied.  Petitioner may request a certificate of appealability from the Court of Appeals.

CONCLUSION

For foregoing reasons, the Court orders as follows:

1. Respondent's motion to dismiss is GRANTED. (Docket No. 14)

2. A Certificate of Appealability is DENIED.

3. Petitioner's motion for an evidentiary hearing and for appointment of counsel is DENIED as moot (Docket No. 21).

The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.


Dated: 3/31/2016

_____
CLAUDIA WILKEN
United States District Judge